[Cite as *State v. Haskell*, 2015-Ohio-3095.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## WYANDOT COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,          CASE NO. 16-15-03

      v.

BRETT A. HASKELL,            O P I N I O N

      DEFENDANT-APPELLANT.


Appeal from Upper Sandusky Municipal Court

Trial Court No. CRB 14-380

**Judgment Affirmed**

**Date of Decision: August 3, 2015**


APPEARANCES:

    *Scott B. Johnson*  for Appellant

    *Richard A. Grafmiller*  for Appellee

Case No. 16-15-03

**ROGERS, P.J.**

{¶1} Defendant-Appellant, Brett Haskell, appeals the judgment of the Upper Sandusky Municipal Court convicting him of one count of sexual imposition and sentencing him to 30 days in jail. On appeal, Haskell argues that the trial court erred by (1) admitting certain hearsay statements; (2) entering a verdict that was not supported by sufficient evidence; (3) entering a verdict that was against the manifest weight of the evidence; and (4) entering a verdict that violated R.C. 2907.06(B). For the reasons that follow, we affirm the trial court's judgment.

{¶2} On June 19, 2014, a criminal complaint was filed in the Upper Sandusky Municipal Court charging Haskell with one count of sexual imposition in violation of R.C. 2907.06(A), a misdemeanor of the third degree. In response, Haskell entered a plea of not guilty to the charge.

{¶3} The matter proceeded to a jury trial on December 11, 2014. S.B. was the first witness to testify on behalf of the State. S.B. testified that she was 14-years-old on February 23, 2014. She stated that she visited her cousin, Haskell's son, the previous night. After a night of bowling, S.B., her cousin, and her cousin's friend returned to Haskell's house. S.B. explained that the three did not get back to the house until late in the evening. When they arrived, they ate pizza and talked in her cousin's room. S.B. testified that she had planned on staying the

-2-

night in her cousin's room, but because her cousin's male friend was staying in his room, she was told to sleep on the couch in the living room.

{¶4} S.B. described the living room as having a couch, coffee table, television, chair, and a mattress lying on the floor. Photographs of the living room were shown to S.B., which were later admitted into evidence. S.B. stated that she did not leave her cousin's room until approximately 4:30 a.m. When she left the room, S.B. testified that Haskell and her Aunt Okie were sleeping on the mattress with their two other children. S.B. could not remember if the television was on or off at the time she went to sleep. She explained that she was lying on her left side when she fell asleep.

{¶5} S.B. testified that she was awoken when she felt a hand touching her pubic region. She then rolled onto her back and felt a hand and fingers pushing on top of her pubic region. S.B. stated that neither the hand nor the fingers touched her vagina. She explained that she was wearing underwear and yoga pants. According to S.B., all the touching occurred on the outside of the clothing.

{¶6} After rolling over, S.B. stated that she opened her eyes and saw it was Haskell that was touching her. She explained, "That's when I seen [sic.] [Haskell] and he jumped back and he moved his hand and asked me if I knew where the remote was." Trial Tr. p. 23. She replied "no" and grabbed her stuff and went

back into her cousin's room. She testified that Haskell got up and moved over to the chair and never said another word.

{¶7} After returning to her cousin's room, she attempted to contact her parents, but her phone was dead. After charging the phone for approximately six minutes, S.B. testified that she called her aunt Laura, uncle Kyle, grandmother, and mother, but was unable to get a hold of anyone. She was finally able to get a hold of her father, Brett Eddy. She told her dad where she was and that she wanted to go home. Her dad asked her what was going on, but she stated that she just wanted to leave. He told S.B. he would try to find her a ride and hung up the phone. At trial, S.B. described herself as being upset, uncomfortable, scared, and was crying after the conversation with her dad.

{¶8} Her dad sent her a text message asking what was wrong. S.B. testified that she told him that Haskell was touching her while she was sleeping. She stated that her father was able to call her aunt, Shannon Elmer, and that Elmer was on her way to get S.B. At some point after these text messages, Eddy called S.B. Shortly after this conversation, Elmer called S.B. and told her to wait outside until she got there.

{¶9} Her cousin woke up and asked what was wrong. S.B., who was crying, stated that she just wanted to go home, but did not want to leave out the front door because she was scared that Haskell was waiting on the other side of the

bedroom door. Her cousin pulled out a knife and cut the plastic covering his bedroom window, and S.B. was able to climb out the window.

{¶10} When Elmer arrived, S.B. testified that she was still crying. Elmer told S.B. to get into the car and asked what was wrong. S.B. told her aunt that Haskell had touched her in her private area. Soon after, S.B. stated that a sheriff deputy, her mother, and her grandmother all arrived at the scene.

{¶11} On cross-examination, S.B. testified that she was interviewed by the sheriff deputy and told him everything that had happened. She admitted though that she omitted some of the more graphic details as she felt very uncomfortable talking with a man about the situation. S.B. was also asked to describe the couch. She described the couch as having three separate cushions, as opposed to a couch with only one individual cushion.

{¶12} Brett Eddy was the next witness to testify. Eddy stated that he was working in Cleveland, Ohio on February 23, 2014. Eddy testified that he received a call from his daughter, S.B., early that morning. Eddy said that S.B. "was crying and asked why she couldn't get a hold of mom, and I told her she's probably sleeping. I asked her what was going on and she said she wanted to go home * * *." *Id.* at p. 53. At this moment, defense counsel objected contending the testimony was inadmissible hearsay. The State argued that the statements made by S.B. to Eddy constituted excited utterances and were admissible. The trial

court overruled the objection. Eddy testified that S.B. was crying during their conversation.

{¶13} Later during his testimony, the following discussion took place:

Q: Did you talk to her on the phone [a second time]?

A: After that, yes, I did. After she texted me what happened, she called me back and I said 'what do you mean he tried to touch you, [S.B.]?'

Q: At this point how was she acting?

A: She was bawling. She's still crying. She said 'when is [Elmer] gonna get here?' She kept asking me 'I just want to go home'. I told her 'go outside and wait'. She said she didn't want to go out of [her cousin's] room; she was afraid. She wanted to wait until [Elmer] to get [sic] here. Then when she talked to me and I asked her 'what do you mean he tried to touch you' and that's when she told me 'I woke up, he was kneeling beside me, he had his hands on my private part, dad, and he was trying to push his fingers in through my pants. I could feel his fingers'. That's when I told her 'stay in [your cousin's] room, I'll be home as soon as I can.'

*Id.* at p. 57-58. Eddy added that S.B. is not normally very emotional. He said the only other time he remembered her acting like this is when he told S.B. her grandfather died.

{¶14} Shannon Elmer was the next witness to testify on behalf of the State. Elmer testified that she was sleeping when she received a phone call from her niece, S.B. Elmer stated that S.B. seemed very upset, was crying, and asked Elmer to come get her. At this time, defense counsel renewed his objection to the hearsay testimony, which was noted by the trial court. After hanging up, Elmer

stated that she drove out to her sister's house to pick up S.B. She explained that the drive took her approximately 20-25 minutes.

{¶15} When Elmer pulled up to the house, S.B. was outside waiting. Elmer stated that S.B. got into the car and was crying. At this point, the prosecutor attempted to elicit testimony regarding what S.B. told Elmer, but defense counsel objected, again citing hearsay. The trial court overruled the objection. Next, Elmer testified that S.B. told her that Haskell had touched her in her pubic region. Elmer said that after she briefly confronted Haskell in the doorway, she called the police.

{¶16} After Elmer's testimony, a brief recess was taken. After reconvening, both parties stipulated that S.B. was 14-years old at the time of the alleged offense and that Haskell was 36-years old.

{¶17} Deputy Michael Hoy of the Wyandot County Sheriff's Office was the last witness to testify on behalf of the State. Deputy Hoy testified that he responded to a call about a young female that was inappropriately touched. When he arrived at the scene, he briefly spoke to the caller, Elmer. Afterwards, he spoke with the victim, S.B. He testified that S.B. "was noticeably upset." *Id.* at p. 80. He added, "Her eyes were bloodshot, she was noticeably crying, she had mascara running down her face. Hands I noticed were kind of trembling somewhat * * *." *Id.*

{¶18} Deputy Hoy also had an opportunity to interview Haskell at the scene. Deputy Hoy then typed up a written report, of which the following was read at trial:

> I had asked [Haskell] if he would know why [S.B.] would make a statement like that and he said that he had no idea. He said that he was sleeping and he was awakened by the cell phone alarm going off and he found it underneath the cushion of the couch that [S.B.] was sleeping under and he retrieved it from underneath her.

*Id.* at p. 93.

{¶19} At the conclusion of Deputy Hoy's testimony, the State rested. At this time, Haskell made a motion for acquittal pursuant to Crim.R. 29. The trial court denied the motion.

{¶20} Haskell testified on his own behalf. Haskell's testimony regarding the night of February 22, 2014, was nearly identical to S.B.'s. Haskell testified that he fell asleep on a mattress in the living room with his girlfriend and two of their children in the early morning hours of February 23, 2014. He stated that the television was still on before he fell asleep.

{¶21} Haskell testified that he was awoken by a cell phone sometime in the morning. He explained that he was very tired when he woke and that he tried to find the phone so he could shut the alarm off and go back to sleep. He stated that he believed the phone was located somewhere near or in the couch where S.B. was sleeping. Haskell testified that he looked under the couch, but could not find it.

He then stated that he heard the alarm go off again and could tell that the phone was located underneath one of the couch cushions. Haskell explained that he uses an alarm, set for 6:15 a.m., to wake up in the morning for work. He claimed that he was finally able to locate the cell phone, which was in between two of the cushions. When he reached for the cell phone, Haskell explained that his hand would have been near S.B.'s knee area.

{¶22} Haskell continued to describe what happened next. He said,

> I had grabbed the remote or the TV - - or the cell phone. I shut it off, I believe I lit a cigarette, I went to the bathroom, I came back in. I was gonna lay back down. I wanted to finish my cigarette, I was gonna turn on the TV to watch the news to check the weather because my son, he's a diehard fisherman so I wanted to surprise him to take him out fishing that day, him and his buddy, and I was looking for the remote which was supposedly - - when I went to bed it was by me and my girlfriend because we were laying on the bed on the floor which is very close proximity * * *.

*Id.* at p. 111. He testified that someone must have turned the television off after he fell asleep. Haskell stated, "At the time of me looking for the remote I was by the bed, right next to my girlfriend looking for the remote. [S.B.] had sat up. I asked her if she knew where the remote was. She said no. She got up and she went into the other room." *Id.* at p. 112. At the conclusion of Haskell's testimony, the defense rested. Haskell did not renew his Crim.R. 29 motion for acquittal.

{¶23} After deliberating, the jury returned a verdict finding Haskell guilty of sexual imposition, and the court sentenced Haskell to 30 days in jail.

{¶24} It is from this judgment that Haskell appeals, presenting the following assignments of error for our review.

*Assignment of Error No. I*

**THE TRIAL COURT ERRED IN ALLOWING THE JURY TO HEAR CERTAIN HEARSAY EVIDENCE AT THE TRIAL.**

*Assignment of Error No. II*

**THE DEFENDANT'S CONVICTION WAS NEITHER SUPPORTED BY THE SUFFICIENCY NOR THE MANIFEST WEIGHT OF THE EVIDENCE.**

*Assignment of Error No. III*

**THE DEFENDANT'S CONVICTION WAS AGAINST THE LAW IN THAT IT WAS BASED SOLELY UPON THE TESTIMONY OF THE VICTIM UNSUPPORTED BY OTHER EVIDENCE.**

*Assignment of Error No. I*

{¶25} In his first assignment of error, Haskell argues that the trial court erred by allowing both hearsay statements into evidence, which did not fall under any recognized exception. We disagree.

{¶26} We review a trial court's admission of testimony for an abuse of discretion. *State v. Bump*, 3d Dist. Logan No. 8-12-04, 2013-Ohio-1006, ¶ 61. "A trial court will be found to have abused its discretion when its decision is contrary to law, unreasonable, not supported by the evidence, or grossly unsound." *State v. Swihart*, 3d Dist. Union No. 14-12-25, 2013-Ohio-4645, ¶ 44, citing *State v. Boles*,

2d Dist. Montgomery No. 23037, 2010-Ohio-278, ¶ 16-18. Under Evid.R. 103(A) and Crim.R. 52(A), we disregard as harmless the admission of improper hearsay evidence unless a substantial right of the party is affected. *State v. Missler*, 3d Dist. Hardin No. 6-14-06, 2015-Ohio-1076, ¶ 60, citing *State v. Richcreek*, 196 Ohio App.3d 505, 2011-Ohio-4686, ¶ 31 (6th Dist.). "Substantial rights are not affected 'where the remaining evidence constitutes overwhelming proof of a defendant's guilty * * *.' " *Bump* at 65, quoting *State v. Jones*, 3d Dist. Van Wert No. 15-11-16, 2012-Ohio-5334, ¶ 34, citing *State v. Murphy*, 91 Ohio St.3d 516, 555 (2001).

{¶27} Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Such statements are inadmissible unless an exception to the hearsay rule applies. Evid.R. 802. One such exception is an excited utterance, which is defined as "a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid.R. 803(2). Further, to fall into the exception, the following four elements must all be satisfied:

> (1) the event must be startling enough to produce a nervous excitement in the declarant, (2) the statement must have been made while the declarant was still under the stress of excitement caused by the event, (3) the statement must relate to the startling event, and (4) the declarant must have personally observed the startling event.

*State v. Tebelman*, 3d Dist. Putnam No. 12-09-01, 2010-Ohio-481, ¶ 27, citing *State v. Taylor*, 66 Ohio St.3d 295, 300-301 (1993).  " 'The controlling factor is whether the declaration was made under such circumstances as would reasonably show that it resulted from impulse rather than reason and reflection.' "  *State v. Bradley*, 3d Dist. Van Wert No. 15-10-03, 2010-Ohio-5422, ¶ 37, quoting *State v. Humphries*, 79 Ohio App.3d 589, 598 (12th Dist.1992).

**{¶28}** At trial, Haskell objected to two different instances of hearsay testimony regarding statements S.B. made to both Eddy and Elmer.  Eddy testified that at approximately 7:30 a.m. he received a phone call from S.B.  Eddy stated that S.B. was crying and kept telling him that she wanted to go home.  Soon after, S.B. called Eddy again.  This time, after S.B. had texted Eddy saying that Haskell had touched her, Eddy asked S.B., "what do you mean he tried to touch you, [S.B.]?"  Trial Tr. p. 57.  Eddy testified that S.B. told him, " 'I woke up, he was kneeling beside me, he had his hands on my private part, dad, and he was trying to push his fingers in through my pants.  I could feel his fingers.' "  *Id.*

**{¶29}** Under *Taylor*, this testimony clearly falls under the excited utterance exception.  First, unwanted sexual contact from an adult to a minor relative is certainly startling to the point of causing a nervous excitement in the minor.  Second, although the statement was not made contemporaneously or right after the contact, S.B. made these statements as soon as she was able to contact someone.

Thus, it is still possible that S.B. made the statement while under the stress of excitement given that she was still crying uncontrollably while talking with Eddy. Furthermore, "the amount of elapsed time between the statements made and the events about which the statements are made is longer for a child victim than an adult victim for purposes of admissibility under Evid.R. 803(2) because children are likely to remain in a state of nervous excitement for a longer period of time." *Bradley* at ¶ 38, citing *State v. Ashcraft*, 12th Dist. Butler No. CA97-11-217, 1998 WL 667657, citing *Humphries* at 598; *see also Taylor* at 304. Third, the statement related to the startling event since S.B.'s statement to her father was in regard to Haskell touching her. Finally, as the declarant, S.B. witnessed the touching. Thus, S.B.'s statements to Eddy were excited utterances and were properly allowed.

{¶30} Elmer testified that she spoke to S.B. twice on February 23, 2014. The first, which occurred slightly after S.B. talked to her father, was brief and consisted of S.B. telling Elmer that she wanted to go and asked Elmer to come get her. Elmer also testified that S.B. sounded very upset on the phone. After about a 20 to 25 minute drive, Elmer arrived and asked S.B. what was wrong. S.B. told Elmer that "[Haskell] had touched her in her private area." Trial Tr. p. 67.

{¶31} These statements also pass the *Taylor* test. The first, third, and fourth prongs are the same as the statements made to Eddy since they are nearly

-13-

the same exact words – that Haskell touched her in the pubic region. The only difference between these statements and the statements to Eddy is that these were made approximately 20-25 minutes after Elmer left to get S.B. As stated supra, the mere passage of time will not remove the statement from being an excited utterance. Moreover, it seems that S.B. was still in a stressful state since she was still crying and visibly upset when Elmer talked with her. Because the statements made to Elmer constitute excited utterances, the trial court did not err by allowing the statements into evidence.

{¶32} Accordingly, Haskell's first assignment of error is overruled.

*Assignment of Error No. II*

{¶33} In his second assignment of error, Haskell argues that the verdict was not supported by sufficient evidence. Additionally, Haskell argues that the verdict was against the manifest weight of the evidence. We disagree.

{¶34} First, we note that Haskell has combined two arguments into one assignment of error. Although Haskell has argued both sufficiency and manifest weight as one argument, they are in fact two separate legal theories, each with their own standard of review. Therefore, we will address the two separately.

*Sufficiency of the Evidence*

{¶35} When an appellate court reviews the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in the light most favorable

to the prosecution, any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 47. Sufficiency is a test of adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, the question of whether the offered evidence is sufficient to sustain a verdict is a question of law. *State v. Wingate*, 9th Dist. Summit No. 26433, 2013-Ohio-2079, ¶ 4.

**{¶36}** Here, Haskell's counsel made a Crim.R. 29 motion at the close of the State's case-in-chief, and the trial court denied his motion for acquittal. Thereafter, Haskell proceeded to present evidence in his defense. Haskell, however, did not renew his Crim.R. 29 motion at the close of his case-in-chief or at the conclusion of all the evidence. Thus, according to this court's precedent, Haskell has waived all but plain error. *State v. Flory*, 3d Dist. Van Wert No. 15-04-18, 2005-Ohio-2251, citing *Edwards*.

**{¶37}** However, "[w]hether a sufficiency of the evidence argument is reviewed under a prejudicial error standard or under a plain error standard is academic." *City of Perrysburg v. Miller,* 153 Ohio App.3d 665, 2003–Ohio–4221, ¶ 57 (6th Dist.), quoting *State v. Brown,* 2d Dist. Montgomery No. 17891, 2000 WL 966161 (July 14, 2000). Regardless of the standard used, "a conviction based

on legally insufficient evidence constitutes a denial of due process." *Thompkins,* 78 Ohio St.3d at 386–387. Accordingly, we will proceed to determine whether the State presented sufficient evidence to support Haskell's conviction.

**{¶38}** If a person has sexual contact with another, who is not the spouse of the offender, and the other person is 13-years-old or older but less than 16-years-old, and the offender is at least 18-years-old and four or more years older than the other person, then that person is guilty of sexual imposition. R.C. 2907.06(A)(4). "Sexual contact" is defined as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B). "Mere proof of the act of touching a described area, however, is insufficient to prove * * * sexual imposition. * * * There must be some evidence of sexual gratification as the purpose of the touching." *State v. Edwards*, 8th Dist. Cuyahoga No. 81351, 2003-Ohio-998, ¶ 21, citing *In re April Anderson*, 116 Ohio App.3d 441, 443 (12th Dist.1996). However, direct testimony is not required to prove sexual arousal or gratification. *Id.* at ¶ 22. Rather, "the existence of prurient motivations may be discerned from 'the type, nature, and circumstances of the contact, along with the personality of the defendant.' " *State v. Uhler*, 80 Ohio App.3d 113, 123 (9th Dist.1992), quoting *State v. Cobb*, 81 Ohio App.3d 179, 185 (9th Dist.1991). "Accordingly, in the

absence of direct testimony regarding sexual arousal or gratification, the trier of fact may infer that a defendant was motivated by a desire for sexual arousal or gratification from the totality of the circumstances." *Edwards* at ¶ 22.

{¶39} At trial, S.B. testified several times that her uncle, Haskell, had touched her pubic region. Further, it was established that S.B. was not Haskell's spouse at the time of the offense. Additionally, both parties stipulated that S.B. was 14 at the time of the offense and Haskell was 36 at the time of the offense. Therefore, the State offered evidence of the age requirements of R.C. 2907.06. Finally, the jury was free to find that the State offered evidence that proved Haskell was motivated by a desire for sexual arousal or gratification under the totality of the circumstances.

{¶40} Under normal circumstances, this would be enough to withstand a Crim.R. 29 motion. However, R.C. 2907.06(B) requires that a person be found not guilty of sexual imposition if the only evidence is that of the victim's testimony unsupported by other evidence. The Supreme Court of Ohio has found that the "corroborating evidence necessary to satisfy R.C. 2907.06(B) need not be independently sufficient to convict the accused, and it need not go to every essential element of the crime charged. Slight circumstances or evidence which tends to support the victim's testimony is satisfactory." *State v. Economo*, 76 Ohio St.3d 56, 60 (1996). In *Economo*, the court found that the following

corroborating evidence was sufficient: (1) medical records showed that the victim and offender had a physician-patient relationship and that the victim had an appointment to see the doctor the day of the alleged offense; (2) the victim's friend testified that she accompanied the victim the day of the alleged offense and was asked by the victim to accompany her into the examination room; and (3) the friend testified that she noticed the victim was on the verge of crying as she left the examination room. *Id.*

{¶41} In *State v. Lieurance*, 3d Dist. Auglaize Nos. 2-12-21, 2-12-23, 2013-Ohio-3875, this court affirmed a conviction for sexual imposition. *Id.* at ¶ 43. In *Lieurance*, the following corroborating evidence was found to be sufficient: (1) a witness' testimony that the victim told him of the incidents shortly after each occurred; (2) that witness' testimony that he confronted the defendant regarding the incidents and that the defendant stated it would never happen again; (3) statements made by the victim and the victim's mother reporting the allegations; (4) the defendant's statements to law enforcement admitting that he and the victim were in close proximity to one other on the night of the incident; and (5) the defendant's statements to law enforcement that he was intoxicated that night and could not remember if the incident occurred. *Id.* at ¶ 29.

{¶42} Here, there are three separate pieces of corroborating evidence. First, S.B., through Elmer, reported the allegations soon after the incident occurred

similar to the victims in *Economo* and *Lieurance*. *See Economo* at 60 ("The fact that [a friend] accompanied [the victim] to the doctor's office * * * permits a reasonable inference that [the victim] reported the alleged sexual activity to her within seven days of the first incident * * * and four days of the second * * *."); *Lieurance* at ¶ 29; *see also State v. Rossi*, 2d Dist. Montgomery No. 22803, 2009-Ohio-1963, ¶ 38. Additionally, her statements remained consistent to everyone to whom she reported the abuse.

**{¶43}** Second, Eddy, Elmer, and Deputy Hoy all testified that S.B. appeared to be upset when they spoke with her. Eddy testified that he had only heard his daughter cry that hard once before when he told her that her grandfather had died. Elmer testified that she was crying over the phone and was visibly upset when she arrived at the scene. Finally, Deputy Hoy testified that S.B. was visibly upset, her mascara had run on her face, her eyes were bloodshot, and she was trembling the whole time during his interview. This type of behavior is similar to the behavior exhibited by the victims in *Economo* and *Rossi*. *See Economo*, 76 Ohio St.3d at 60; *Rossi* at ¶ 38.

**{¶44}** Third, Haskell admitted to being in close proximity to S.B. as well as admitted that he asked S.B. if she had seen the television remote. At trial, Haskell testified that he not only slept in the same room as S.B., but also that he went over to the couch and reached near S.B.'s knee to retrieve a cell phone. *See Economo*

at 60 (the victim was in the same room as the defendant when the incident occurred); *Lieurance*, 2013-Ohio-3875 at ¶ 29 (defendant admitted that he was in close proximity to the victim the night of the incident). Also, Haskell's testimony that he asked S.B. if she had seen the remote corroborates her testimony that when Haskell allegedly quickly removed his hand from her pubic region that he asked her if she had seen the remote.

**{¶45}** Since the State presented the testimony of S.B. that was corroborated by other evidence, the State complied with the requirements of R.C. 2907.06(B). After viewing the evidence in the light most favorable to the State, we find that any rational trier of fact could have found that the essential elements of sexual imposition were proven beyond a reasonable doubt.

*Manifest Weight of the Evidence*

**{¶46}** When an appellate court analyzes a conviction under the manifest weight standard, it "sits as the thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 83 (1997). Accordingly, it must review the entire record, weigh all of the evidence and its reasonable inferences, consider the credibility of the witnesses, and determine whether the fact finder "clearly lost its way" in resolving evidentiary conflicts and "created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v.*

*Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). When applying the manifest weight standard, a reviewing court should only reverse a trial court's judgment "in exceptional case[s]" when the evidence "weighs heavily against the conviction." *Id*. at paragraph three of the syllabus.

{¶47} Having disposed of Haskell's sufficiency arguments, we similarly reject his manifest weight arguments. The crux of Haskell's argument seems to be that the prosecutor placed an emphasis on a gap of time between Haskell's testimony regarding when he searched for the cell phone to the point where he searched for the television remote. Haskell also argues that because the prosecutor was confused about what Haskell asked S.B., i.e. "where is the cell phone" versus "where is the remote," the jury erred by discrediting Haskell's testimony. However, the jury heard from S.B. who testified that Haskell was touching her in her pubic area and that when she awoke Haskell quickly removed his hand and asked her if she knew where the remote was. The jury never heard S.B. testify that Haskell asked her where the cell phone was. That was simply the prosecutor's error in saying cell phone instead of remote. Finally, the jury also heard from three separate people that testified that S.B. told them that Haskell had touched her inappropriately.

{¶48} Thus, it appears the jurors found the State's witnesses more credible than Haskell's own testimony. *See State v. Wareham*, 3d Dist. Crawford No. 3-

12-11, 2013-Ohio-3191, ¶ 25 ("[J]urors are entitled to believe the testimony offered by the State's witnesses"); *State v. Clark*, 101 Ohio App.3d 389, 400 (8th Dist.1995) ("It is well established that the * * * credibility of witnesses [is] primarily [a] matter[] for the trier of fact."). After a thorough review of the record, we cannot say that this is the exceptional case where the trier of fact lost its way and committed a miscarriage of justice by finding Haskell guilty of sexual imposition.

{¶49} Accordingly, Haskell's second assignment of error is overruled.

*Assignment of Error No. III*

{¶50} In his third assignment of error, Haskell argues that the verdict is contrary to law since the State failed to provide corroborating evidence of S.B.'s testimony as required by R.C. 2907.06(B). As we discussed in more detail supra, we find that the following is sufficient to constitute corroborating evidence: (1) the allegations were quickly reported to law enforcement; (2) three witnesses testified that S.B. was crying while on the phone and was visibly upset shortly after the alleged contact; and (3) Haskell's admission that he was in close proximity to S.B. the morning of the alleged incident.

{¶51} Haskell also argues that the jury should have been instructed on this requirement. However, the corroborating evidence requirement is a test of sufficiency, which is an issue of law to be determined by the trial judge. *See State*

*v. Curtis*, 12th Dist. Butler No. CA2008-01-008, 2009-Ohio-192, ¶ 93, citing *Economo*, 76 Ohio St.3d at 60 (finding the trial court did not err by not instructing the jury regarding the corroborating evidence requirement). Therefore, the jury was not required to be instructed on this issue.

{¶52} Accordingly, Haskell's third assignment of error is overruled.

{¶53} Having found no error prejudicial to Haskell in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW and WILLAMOWSKI, J.J., concur.**

**/jlr**